IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EARNEST SCOTT, Jr., | : |
| Plaintiff | : |
| v. | : Case No. 3:21-cv-194-KAP |
| NURSE CONOR MYERS, *et al.*, | : |
| Defendants | : |

<u>Memorandum Order</u>

    Defendants' motion for summary judgment, ECF no. 118, is granted. The various open motions are denied: ECF no. 111, seeking additional time to file plaintiff's pretrial statement, because it is moot, *see* the pretrial statement at ECF no. 112; ECF no. 113, the latest motion to appoint counsel, for the same reasons given in all the other denials, *see e.g.* ECF no. 83 and Local Civil Rule 10; and ECF no. 114 and ECF no. 123, to conduct additional discovery, to compel, and for sanctions, because they are meritless.

    On November 4, 2021, plaintiff Scott, an inmate in the state prison system who was then at S.C.I. Houtzdale, signed a complaint against three defendants – Nurse John Doe, nursing supervisor Michael Radaker, and Correct Care Solutions, their employer - alleging that on May 13, 2021, he had been skipped for his afternoon/evening dose of insulin; Scott implied that perhaps this was because he had moved from cell HD-12 to HD-10. After Scott had eaten dinner, some two hours later he asked about his insulin and both a corrections officer and the other inmates in the RHU told him that the nurse had come and gone. Scott asked that the nurse be contacted. A corrections officer allegedly did that and then told Scott that the nurse told him "he will be okay until tomorrow insulin [sic]." Scott alleged that when he wrote a grievance, Radaker falsely replied that Scott had been on a hunger strike. Scott alleged that "the same incident just happened again, on 10/29/2021." Scott wrote that his eyes and kidneys "hurt" and he "couldn't stop peeing" the night after the May incident; he offered no similar details about the October incident. As relief, Scott sought a declaration that his rights under the Eighth Amendment had been violated, and nominal and punitive damages, but not compensatory damages.

    Scott filed many complaints while at Houtzdale, and this is Scott's second complaint (by date of occurrence) against Radaker over Scott's allegations that delivery of his insulin was being mismanaged. Scott has also filed many grievances and has become familiar with the requirements of administrative exhaustion and the three-step administrative remedy procedure created by DC-ADM 804. By 2022, Scott had amended the complaint several times with permission, to delete Correct Care and to add as defendants the Department of Corrections, Lieutenant Pancoast and Corrections Officer Kephart (who allegedly were working in the RHU on October 29, 2021), Jon Altemus (the

1

nursing supervisor on October 29, 2021), and to identify the John Doe nurse responsible for delivering his insulin on both occasions as Conor Myers. As finalized in the Third Amended Complaint in March 2022, ECF no. 25, Scott alleged that on September 23, 2021, he had received the final decision on his grievance (Grievance No. 927495) about the May 13, 2021 incident. This date is confirmed by the exhibits filed with defendants' motion for summary judgment. Scott refrained from stating the date he allegedly received a final decision relating to the grievance (Grievance No. 952494) about the October 29, 2021 incident. The defendants attach as an exhibit to their motion for summary judgment the final decision on that grievance and it is dated April 1, 2022.

In the Third Amended Complaint, Scott gave substantially the same account of the May 13, 2021 incident given in the original complaint and alleged that after the October 29, 2021 incident he suffered the same types of pain that he suffered in May. Scott also gave more background about the October 29, 2021 incident: Scott alleged that he was in a psychiatric observation cell and had covered his window with feces, and defendants Pancoast and Kephart told him he would not get his insulin unless he licked the feces off. Scott alleged that the Department of Corrections had inmates whose prison job was to clean cells, and Pancoast and Kephart could have escorted him to the shower while his cell was being cleaned so that he would get his insulin on schedule. Scott alleged that when he wrote a grievance about this incident Altemus responded that Scott had been marked down as a refusal because Altemus stated that Scott had covered himself, and not just his cell window, with his feces.  Scott alleges that Altemus' statement that Scott smeared himself with feces was false.

In the claims for relief portion of the Third Amended Complaint, Scott added to his original Eighth Amendment claim the claim that the Department of Corrections violated his rights under the Rehabilitation Act and Americans with Disabilities Act because as an insulin-dependent diabetic he was an individual with a disability under the ADA/RA and the denial of insulin denied him "adequate medical services/care." Scott alleged that the individual defendants also violated his statutory rights by failing to "provide appropriate medical attention" and by other generalities such as failing "to adopt appropriate policies" and "failing to comply with the laws." Scott again sought a declaration that his rights under the Eighth Amendment had been violated and nominal and punitive damages, but not compensatory damages.

After discovery, defendants moved for summary judgment. The defendants contend that Scott was on an announced hunger strike on May 13, 2021 and refused his insulin; and that on October 29, 2021 Scott's conduct in smearing himself and his cell with feces constituted a refusal of his insulin. ECF no. 120, defendants' statement of facts, and ECF no. 121, Appendix. In response, Scott asserts that events unfolded  more or less as he alleged them in his Third Amended Complaint. *See* ECF no. 126, Scott's

counterstatement of facts. Scott considers it significant that in the October 29, 2021 incident he only smeared his cell and not himself with feces, although his argument that defendants are liable because they could and should have cleaned his cell and given him his insulin on schedule would equally imply that if they had wanted to they could and should have cleaned him up too.

I can grant summary judgment on grounds not raised by the parties so long as they are on notice to come forward with all relevant evidence. Fed.R.Civ.P. 56(f)(2),(3). It appears that Scott's complaint as to the October 29, 2021 incident is completely barred by his failure to exhaust administrative remedies. The standard practice is for the court to identify the issue and have the parties muster all the necessary evidence, although even when the court does not give advance notice, the losing party must show some prejudice from that lack of opportunity, that is, that the party could have produced new favorable evidence or arguments had prior notice been given. *See* Good v. Walworth, 2023 WL 9320823 at *3 (6th Cir. Aug. 22, 2023), *cert. denied,* 144 S. Ct. 1071, 218 L. Ed. 2d 248 (2024), *citing* Smith v. Perkins Bd. of Educ., 708 F.3d 821, 829 (6th Cir. 2013). As the record is clear, no factual development is necessary to decide the nonjury legal question of the adequacy of exhaustion, a preliminary issue for which no right to a jury trial exists. *See* Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013).

The Prison Litigation Reform Act amended the Civil Rights of Institutionalized Persons Act to provide: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.§ 1997e(a). Use of "until" means that exhaustion is a mandatory precondition to suit. *See* Booth v. Churner, 532 U.S. 731, 734 (2001); Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion requirement implies proper exhaustion, Woodford v. Ngo, 548 U.S. 81, 90-91 (2006), together with the corollary proposition that lack of proper exhaustion carries with it the sanction of dismissal for procedural default. *Id.*, 548 U.S. at 102; *see* Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004); *see also* Jones v. Bock, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.")

It is certain that as to the latter incident Scott did not exhaust at all his administrative remedies under the three-step process mandated by DC-ADM 804, which is the relevant (and exclusive) administrative remedy, *see* Prater v. Department of Corrections, 76 F.4th 184 (3d Cir. 2023), before commencing this action. As the Court of Appeals described it in Prater:

> ADM 804 creates the three-step Inmate Grievance System. First, an inmate must submit a grievance to the Facility Grievance Coordinator. The grievance must include the relevant facts, individuals involved, claims alleged, and relief sought. A

3

different official—the Grievance Officer—reviews the grievance and submits an initial response. The inmate may appeal the initial response to the Facility Manager, who reviews it and issues a decision. The inmate may file a final appeal to the Secretary of Corrections' Office of Inmate Grievances and Appeals.

*Id.*, 76 F.4th at 203–04.

Scott signed his complaint on November 4, 2021, and expressly pleads in the Third Amended Complaint he filed in March 2022 that he exhausted his remedies as to the May 13, 2021 incident in September 2021 before filing suit. That is consistent with the usual timeframes for grievances in the Department of Corrections. Scott's claim that he fully exhausted his remedies as to the October 29, 2021 incident was obviously wrong from the moment it was made in November 2021. October 29, 2021 was a Friday. If Scott had written a grievance on the spot (as he did on May 13, 2021) that would still require that the grievance have been assigned to Altemus for his response, returned to the grievance officer and decided and returned to Scott, then appealed to the superintendent and decided and returned to Scott, then appealed to the central office in Harrisburg and decided, all by the following Thursday. Defendants confirm, in Exhibits D and I to their motion for summary judgment, that in the actual grievance process this unlikely chain of events did not take place. Scott himself submitted part of his grievance history showing that his initial grievance was dated October 31, 2021 and was received on Monday November 1, 2021.

As for the May 13, 2021 incident, the defendants argue that Scott defaulted any ADA/RA claim by failure to allege a basis for the claim in the grievance. Defendant Department of Corrections is correct about the lack of exhaustion. It has been settled for about two decades that in the absence of any justifiable excuse, an inmate's "failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies." Williams v. Pennsylvania, Department of Corrections, 146 Fed.Appx. 554, 557 (3d Cir. 2005). Amendments to DC-ADM since 2004 also require inmates to request relief with specificity in their initial grievance. Walker v. Little, No. 22-3451, 2023 WL 2570562, at *1 (3d Cir. Mar. 20, 2023). Scott requested $2.5 million in punitive damages in his initial grievance after the May 13, 2021 incident without either mentioning the ADA/RA or identifying the Department as a defendant: the only person Scott mentioned is the unknown nurse ultimately identified as defendant Myers. Since punitive damages are not available in private suits under the ADA/RA, Barnes v. Gorman, 536 U.S. 181, 189 (2002), Scott could not by asking for punitive damages against nurse Doe exhaust an ADA/RA claim against the Department. Scott failed completely to request specific relief in his initial grievance after the October 29, 2021 incident ("Relief sought: to be determined by courts.").

4

Since lack of exhaustion is an affirmative defense (pleaded as defendants' sixth affirmative defense) if the failure to exhaust were factually in dispute I would have to consider if there is a genuine issue of fact about whether the administrative remedy was "unavailable," *see* Ross v. Blake, 578 U.S. 632, 643-44 (2016) to Scott. As the Supreme Court established in Ross v. Blake, a remedial system like DC-ADM 804 is unavailable if the inmate is prevented by obstruction or intimidation from filing a grievance or if it is so opaque or meaningless as to be a sham. DC-ADM 804 has never been held to be a sham. Inmates often explain their lack of use of a grievance system by claiming obstruction of some kind, *see e.g.* Spada v. Martinez, 663 Fed.Appx. 112 (3d Cir. 2016). Scott cannot do this because he alleges that he in fact used the grievance system.

The substantive law as to both incidents is well-settled. A triable claim that an inmate was denied medical care in violation of the Eighth Amendment, Estelle v. Gamble, 429 U.S. 97 (1976) requires evidence showing: (1) that the plaintiff had a serious medical need; (2) that a defendant was deliberately indifferent to it; and (3) that the deliberate indifference to the serious medical need caused the inmate harm. A defendant is "deliberately indifferent" when that defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Claims under the ADA and Rehabilitation Act are essentially the same. A claim under Title II of the ADA, 42 U.S.C.§ 12132 ("[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"), requires evidence: (1) that plaintiff is a person with a disability; (2) who is otherwise qualified for the benefit of some service, program, or activity; and (3) who has been denied that benefit "by reason of" the disability. Under the Rehabilitation Act, a plaintiff must show: (1) a disability; (2) that plaintiff is otherwise qualified for the benefit that has been denied; (3) the denial is solely by reason of his disability; and (4) that the benefit is part of a program or activity receiving Federal financial assistance. Baxter v. Pennsylvania Department of Corrections, 661 Fed.Appx. 754, 756–57 (3d Cir. 2016).

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to point to facts sufficient to establish the existence of any element to that party's claim or defense for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact: if it does so the non-moving party who bears the burden of proof at trial must set forth "specific facts showing that

there is a genuine issue for trial." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine if and only if the evidence is such that a reasonable jury properly instructed as to the substantive law governing the disputed claim or defense could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The overall question to be answered is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir.1990). In this case the facts and the law are such that defendants must prevail. Here, I reverse the usual order of decision and discuss the law first because Scott's complaint alleges no physical injury and his prayer for relief seeks no compensatory damages. (In his pretrial statement Scott, with no support of any kind, claims that these two incidents caused him kidney stones. No details as to dates or treatment for this are given.)

Scott seeks injunctive and declaratory relief and nominal and punitive damages. Under City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983), even if Scott were still at Houtzdale and could prove a past injury, that would confer no standing on him to seek injunctive relief. Scott's transfer to Huntingdon unquestionably would moot any claim for injunctive relief, even if he had one.

Scott has no standing to seek declaratory relief because declaratory judgment is a similarly forward-looking remedy. Judge Sloviter, writing for the Court of Appeals a quarter century ago, explained:

> A declaratory judgment or injunction can issue only when the constitutional standing requirements of a "case" or "controversy" are met. *See* U.S. Const., art. III, § 2; *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Although declaratory judgments are frequently sought in advance of the full harm expected, they must still present a justiciable controversy rather than "abstract, hypothetical or contingent questions." *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). We have explained that these standing requirements are satisfied when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Step–Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir.1990) (quoting *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. 510).

St. Thomas--St. John Hotel & Tourism Association, Inc. v. Government of U.S. Virgin Islands, 218 F.3d 232, 240 (3d Cir. 2000).

Because injunctive and declaratory relief are forward-looking remedies, past injury in itself confers no standing to seek such relief even against the exact same injury. Scott claims that Myers skipped his insulin dose on two occasions in the course of several years

at Houtzdale. Scott has never even alleged facts, much less pointed to evidence, that makes it plausible that the two events he bases his claims on will occur again, or that these defendants would be involved. At the summary judgment stage Scott must produce some evidence, to have standing to seek prospective relief, that would "establish a real and immediate threat that he would again be [the victim of the allegedly unconstitutional practice.]" Brown v. Fauver, 819 F.2d 395, 400 (3d Cir. 1987), quoting City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983). See also Jones v. Unknown D.O.C. Bus Driver & Transportation Crew, 944 F.3d 478, 483 (3d Cir. 2019).

Declaratory relief is unavailable to a party who seeks solely to obtain a determination that an opposing party's past conduct was wrong. Taggart v. Saltz, 855 Fed.Appx. 812, 815 (3d Cir. 2021), citing Waller v. Hanlon, 922 F.3d 590, 603 (5th Cir. 2019). Waller v. Hanlon, in turn, at 922 F.3d 603–04, cited Ashcroft v. Mattis, 431 U.S. 171, 172 (1977) (*per curiam*). The Supreme Court made it clear that where a plaintiff alleges only past injury, a plaintiff has no standing to seek declaratory relief because no present legal right is at stake. In Ashcroft v. Mattis, Mattis' 18-year-old son was shot and killed by police while attempting to escape arrest, and Mattis filed suit in federal court for money damages and a declaratory judgment that the Missouri statute authorizing the use of deadly force was unconstitutional. The damages claim was dismissed without appeal. The Supreme Court held that since the liability of the police officers had been finally decided, neither the academic value of answering hypothetical questions or the emotional satisfaction to the successful party from a favorable ruling gave a federal court jurisdiction to issue a declaratory judgment about whether the use of force statute was constitutional. See Ashcroft v. Mattis, 431 U.S. at 172-73. That applies with full force to Scott's claims.

Of course, neither the ADA nor the Rehabilitation Act create a cause of action for damages against any of the individual defendants. Those statutes address the liability of employers and places of public accommodation (including prisons), and other organizations, not those of the employees. Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002). For a damages claim against the Department of Corrections, if Scott had a claim under Title II of the ADA (since as noted above there is no claim for punitive damages and Scott did not seek compensatory damages), it would be necessary to determine whether the alleged conduct also violates the Fourteenth Amendment or otherwise warrants the abrogation of state sovereign immunity. Baxter v. Pennsylvania Department of Corrections, supra, 661 Fed.Appx. at 756. But Scott has no claim, either under the ADA or the Rehabilitation Act. Scott has tried in numerous complaints to duplicate his Eighth Amendment claims by repeating them as ADA/Rehabilitation Act claims. As Scott knows (because he filed objections that are pending), I discuss this at greater length at ECF no. 17 in Scott v. Department of Corrections, Case no. 3:22-cv-221-SLH-KAP (W.D.Pa). I give a short version here.

A denial of medical care is not a denial to an "otherwise qualified individual" of a benefit, service, or program "by reason of disability." As Courts of Appeals have recognized, it distorts the plain meaning of the English language to claim denials of medical care to a disabled person are denials of benefits to an otherwise qualified individual because of a disability. As the Second Circuit stated, if Congress intended the ADA or Rehabilitation Act to apply in this manner, "it chose strange language indeed." United States v. Univ. Hosp., State Univ. of New York at Stony Brook, 729 F.2d 144, 156 (2d Cir. 1984)(RA claim); *see also* Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005)("Fitzgerald would not have been "otherwise qualified" for such treatment in the absence of his alleged disability—his alleged disability in this case was the reason why Fitzgerald was seeking medical treatment."); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir.1996)("ADA does not create remedy for medical malpractice"), *cited with approval in* Beckett v. Pennsylvania Department of Corrections., 597 Fed.Appx. 665, 667 (3d Cir. 2015).

So, what is left? Overlooking Scott's failure to exhaust, his Eighth Amendment claim against Conor Myers, the individual defendant responsible for allegedly skipping him and not coming back with his insulin on May 13, 2021. Scott's claim for nominal damages against Myers is equivalent to a claim for declaratory relief, and equally not available under Ashcroft v. Mattis.

That leaves Scott's Eighth Amendment claim that without compensatory damages he should get punitive damages from Myers alone for his role in the May 13, 2021 incident, since Radaker's liability is based on his response to Scott's grievance and the other named defendants were not involved in this incident at all.

The Prison Litigation Reform Act, as codified at 18 U.S.C.§ 3626(a)(1)(A), prohibits the award in a prison civil rights action of any "prospective relief" which is not "necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." The PLRA's definition of prospective relief is contained in 18 U.S.C.§ 3626(g)(7): "all relief other than compensatory money damages." Punitive damages are by definition not compensatory damages and do not "correct a violation" of a plaintiff's rights; punitive damages are awarded as punishment, to deter future wrongful conduct by a defendant. Scott cannot get them at all as a matter of statutory construction.

Even if the PLRA did not exist, Scott's claim for punitive damages against Myers would require evidence that would allow a conclusion that Myers' conduct was "outrageous," or taken "with evil motive," or with "a quantum of outrageous conduct *in addition* to that undergirding the … liability." See In re Lemington Home for the Aged, 777 F.3d 620, 634 (3d Cir. 2015)(collecting cases). Assuming the jury believed Scott's account in full, at most a jury could conclude that Myers did not want to be bothered coming back to the RHU hours after he left. From prior lawsuits alone it is certain that

Myers and Radaker had by this point several months of experience with Scott and his insulin needs. If a jury concluded that Myers told the corrections officer to tell Scott he'd be fine until his next scheduled shot, *see* Scott's Counterstatement of facts at ¶6, *see also* ¶8, Scott offers nothing about his condition or the results of the testing of his glucose level that would indicate that Myers' alleged statement that Scott would be fine until the next day was wrong, much less the product of deliberate indifference.

Scott admits that he was on a declared hunger strike on May 12, 2021 and refused his insulin on May 12, 2021. Scott states that he ended this the next day by taking a food tray. On the afternoon of May 13, 2021, a nurse named Wendy Dipko tested Scott's glucose level in response to Scott's report of "feeling low." Radaker, in response to Scott's grievance, noted that the result of the glucose check was 198 mg/dcl, and that it was not critically high. Radaker also claimed that Scott refused insulin. Scott does not dispute the testing, but claims that he refused insulin only on May 12, 2021, not May 13, 2021. Counterstatement of facts at ¶6. But when Scott saw Dipko on May 13, 2021, he made no claims of suffering from that refusal to Dipko or anyone else, only that he felt "low." Scott offers no evidence from which a jury could conclude that despite Scott's lack of discomfort from refusing insulin on May 12, 2021 and his glucose results on the afternoon of May 13, 2021, Myers not only should have concluded that Scott was in danger of "excruciating pain" on May 13, 2021, but did in fact conclude that Scott was in danger on May 13, 2021 and disregarded this conclusion. There is no claim that this alleged disregard caused any injury beyond transitory pain, much less evidence of outrageousness so far beyond deliberate indifference that punitive damages should be awarded.

Scott's obvious belief is that Myers *et al.* are strictly liable for missing any insulin dose. That is not the law. The evidence of record would never support a jury verdict of deliberate indifference or justify an award of punitive damages. Summary judgment is ordered in favor of the defendants. The Clerk shall mark this matter closed.

DATE: July 15, 2024

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel of record and by U.S. Mail to:

Ernest Scott, Jr. ND-3773
S.C.I. Huntingdon
1100 Pike Street
Huntingdon, PA 16652